UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>378 North Main Avenue<br>Tucson, AZ 85701, | ) ) ) ) | Civil No:  16-00503 |
| Plaintiff, | ) ) ) | COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |
| v. | ) ) | |
| SALLY M.R. JEWELL, Secretary of the<br>Interior, U.S. Department of the Interior<br>1849 C Street NW<br>Washington, DC  20240, | ) ) ) ) ) | |
| and | ) ) | |
| U.S. FISH AND WILDLIFE SERVICE,<br>1849 C Street NW<br>Washington, DC  20240, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## INTRODUCTION

1.       Plaintiff Center for Biological Diversity ("Center") brings this action under the

Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA"), to challenge the Secretary of the

Interior's ("Secretary") and the U.S. Fish and Wildlife Service's ("FWS") (collectively,

"Defendants" or "FWS") failure to make mandatory findings on whether nine highly-imperiled

species should be listed as threatened or endangered under the ESA.  16 U.S.C. § 1533(b)(3)(B).

These species are: alligator snapping turtle (*Macrochelys temminckii*), Barrens topminnow

(*Fundulus julisia*), beaverpond marstonia (*Marstonia castor*), California spotted owl (*Strix*

*occidentalis occidentalis*), Canoe Creek pigtoe (*Pleurobema athearni*), foothill yellow-legged

frog *(Rana boylii)*, Northern Rockies fisher (*Martes pennanti*), Virgin River spinedace

(*Lepidomeda mollispinis mollispinis*), and wood turtle (*Macrochelys temminckii*).  Each of these species is experiencing steep population declines and ongoing threats to its existence.

2.      To obtain federal safeguards and habitat protections, the Center and/or other conservation groups submitted to FWS petitions to list each of these nine species as "endangered" or "threatened" pursuant to the ESA.  FWS made initial, 90-day findings that each petition presented substantial information showing that listing the species "may be warranted." 16 U.S.C. § 1533(b)(3)(A); *see also* 76 Fed. Reg. 59,836 (Sept. 27, 2011) (Barrens topminnow, beaverpond marstonia, and Canoe Creek pigtoe); 80 Fed. Reg. 37,568 (July 1, 2015) (alligator snapping turtle and foothill yellow-legged frog); 80 Fed. Reg. 56,423 (Sept. 18, 2015) (California spotted owl, Virgin River spinedace, and wood turtle); 81 Fed. Reg. 1368 (Jan. 12, 2016) (Northern Rockies fisher).  FWS was therefore required to determine whether listing these species as "endangered" or "threatened" is "warranted" within 12 months of receiving the petitions, yet it has failed to make these requisite findings to date.  16 U.S.C. § 1533(b)(3)(B). Defendants are therefore in violation of the ESA.  *Id.*

3.      To remedy these violations, the Center seeks declaratory relief to affirm that Defendants are in violation of the ESA by failing to make 12-month findings on the petitions to list these nine species, along with injunctive relief that establishes dates certain for Defendants to determine if listing these species as endangered or threatened is warranted.  Compliance with the nondiscretionary deadlines of the ESA is necessary to ensure the continued existence and recovery of these species in the wild.

## JURISDICTION

4.      The Court has jurisdiction over this action pursuant to 16 U.S.C. §§ 1540(c) and (g)(1)(C) (action arising under the ESA's citizen suit provision), 5 U.S.C. § 702 (review of

agency action under the APA), and 28 U.S.C. § 1331 (federal question jurisdiction).

5.     The Court may grant the relief requested under the ESA, 16 U.S.C. § 1540(g); the APA, 5 U.S.C. §§ 701-706; and 28 U.S.C. §§ 2201 and 2202 (declaratory and injunctive relief).

6.     The Center provided 60 days notice of its intent to file this suit pursuant to the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g)(2)(C), by letters dated November 3, 2014 (Northern Rockies fisher); December 23, 2015 (foothill yellow-legged frog); December 22, 2015 (wood turtle and alligator snapping turtle); December 30, 2015 (Barrens topminnow, beaverpond marstonia, and Canoe Creek pigtoe); January 11, 2016 (California spotted owl); and January 22, 2016 (Virgin River spinedace).  Defendants have not remedied the violations to date, thus an actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

## VENUE

7.     The U.S. District Court for the District of Columbia is the proper venue for this action pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e).  Defendants' headquarters are located within this district, and a substantial part of the events giving rise to the Center's claim occurred in this district.

## PARTIES

8.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a nonprofit organization incorporated in California and headquartered in Tucson, Arizona, with field offices throughout the United States and Mexico, including Alaska; Arizona; California; Florida; Hawaii; Idaho; Minnesota; Nevada; New Mexico; New York; Oregon; Washington; Washington, D.C.; and La Paz, Baja California Sur, Mexico.  The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.  The Center has more than 50,000 members.  The Center and its members are concerned with the conservation of

imperiled species – including the alligator snapping turtle, Barrens topminnow, beaverpond marstonia, California spotted owl, Canoe Creek pigtoe, foothill yellow-legged frog, Northern Rockies fisher, Virgin River spinedace, and wood turtle – and with the effective implementation of the ESA.

9.      The Center has members who visit areas where the alligator snapping turtle, Barrens topminnow, beaverpond marstonia, California spotted owl, Canoe Creek pigtoe, foothill yellow-legged frog, Northern Rockies fisher, Virgin River spinedace, and wood turtle are known to still occur.  The Center's members use these areas for observation of these species and other wildlife; for research; nature photography; aesthetic enjoyment; and recreational, educational, and other activities.  The Center's members derive professional, spiritual, and economic benefits from these species and their habitats.  Those members have concrete plans to continue to travel to and recreate in areas where they can observe these species and will continue to maintain an interest in these species and their habitats in the future.

10.      In addition to submitting petitions to list these species under the ESA, the Center and its members have participated in conservation efforts.  For example, the Center has campaigns to protect biodiversity in the Southeastern United States and to raise awareness about the environmental impacts from human activities, including impacts to imperiled species. Likewise, the Center is actively engaged in efforts to protect native plants and animals from the effects of climate change.  Protecting the species at issue under the ESA would further these campaigns.

11.      The Center's conservation efforts are prompted by the concern that the alligator snapping turtle, Barrens topminnow, beaverpond marstonia, California spotted owl, Canoe Creek pigtoe, foothill yellow-legged frog, Northern Rockies fisher, Virgin River spinedace, and wood

turtle are at serious risk of extinction.  Defendants' failure to comply with the ESA's

nondiscretionary deadline for issuing 12-month findings on these species deprives them of

statutory protections that are vitally necessary to their survival and recovery.  Until these species

are protected under the ESA, the Center's interest in their conservation and recovery is impaired.

Therefore, the Center's members and staff are injured by Defendants' failure to make a timely

determination as to whether listing these species is warranted, as well as by the ongoing harm to

the species and their habitats in the absence of such protections.  The injuries described above

are actual, concrete injuries presently suffered by the Center and its members, and they will

continue to occur unless this Court grants relief.  These injuries are directly caused by

Defendants' inaction, and the relief sought herein – an order compelling listing decisions for

these species – would redress these injuries.  The Center and its members have no other adequate

remedy at law.

12.    Defendant SALLY M.R. JEWELL is the Secretary of the Interior and is the

federal official in whom the ESA vests final responsibility for making decisions and

promulgating regulations required by and in accordance with the ESA, including listing and

critical habitat decisions.  Secretary Jewell is sued in her official capacity.

13.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the agency

within the Department of the Interior that is charged with implementing the ESA for most

terrestrial species as well as ensuring prompt compliance with the ESA's mandatory listing

deadlines.

## LEGAL BACKGROUND

14.    The ESA is a comprehensive federal statute declaring that endangered and

threatened species are of "esthetic, ecological, educational, historical, recreational, and scientific

value to the Nation and its people." 16 U.S.C. § 1531(a)(3).  Accordingly, the purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species …." *Id*. § 1531(b).

15.     To this end, section 4 of the ESA requires the Secretary to protect imperiled species by listing them as either "endangered" or "threatened." *Id*. § 1533(a).  A "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16).

16.     The ESA's conservation measures apply only after the Secretary lists a species as threatened or endangered.  For example, section 7 of the ESA requires all federal agencies to ensure that their actions do not "jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of a listed species' "critical habitat." *Id*. § 1536(a)(2).  Section 9 of the ESA prohibits, among other things, "any person" from intentionally taking listed species or incidentally taking listed species without a lawful authorization from the Secretary. *Id*. §§ 1538(a)(1)(B) and 1539.  Concurrently with listing, the Secretary must designate the species' critical habitat, which includes areas that are essential to the conservation of the species. *Id*. §§ 1532(5)(A) and 1533(a)(3)(A).  Other provisions of the ESA require the Secretary to "develop and implement" recovery plans for listed species, authorize the Secretary to acquire land for the protection of listed species, and make federal funds available to states to assist in their efforts to preserve and protect listed species. *Id*. § 1533(f), § 1534, and § 1535(d).

17.     To ensure the timely protection of species that are at risk of extinction, Congress set forth a detailed process whereby citizens may petition the Secretary to list a species as endangered or threatened.  The process includes mandatory, non-discretionary deadlines that the

Secretary must meet so that imperiled species receive the ESA's substantive protections in a timely fashion. The three required findings, described below, are the 90-day finding, the 12-month finding, and the final listing determination. The Secretary has delegated responsibility for making these findings to FWS.

18.     Upon receiving a listing petition, FWS must "to the maximum extent practicable, within 90-days" make an initial finding as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* § 1533(b)(3)(A). If FWS finds that the petition does not present substantial information indicating that listing may be warranted, the petition is rejected and the process ends.

19.     If FWS instead determines that a petition does present substantial information indicating that listing may be warranted, then the agency must conduct a full scientific review of the species' status. *Id.* Upon completion of this status review, and within 12 months from the date that it receives the petition, FWS must make one of three findings: (1) listing is "not warranted"; (2) listing is "warranted"; or (3) listing is "warranted but precluded" by other pending proposals for listing species, provided certain requirements are met. *Id.* § 1533(b)(3)(B).

20.     If FWS's 12-month finding concludes that listing is warranted, the agency must publish notice of the proposed regulation to list the species as endangered or threatened in the Federal Register for public comment. *Id.* § 1533(b)(3)(B)(ii). Within one year of publication of the proposed regulation, the ESA requires FWS to render its final determination on the proposal. *Id.* § 1533(b)(6)(A). At such time, FWS must either list the species, withdraw the proposed listing rule, or, if there is substantial disagreement about scientific data, delay a final determination for up to six months in order to solicit more scientific information. *Id.* §§

1533(b)(6)(A)(i) and 1533(b)(6)(B)(i).

21.     Because the ESA does not safeguard a species facing extinction until it is formally listed as endangered or threatened, it is critical that FWS meticulously follow the ESA's listing procedures and deadlines so that such species are protected in a timely manner. Defendants have regularly ignored these statutory procedures and have missed statutory listing deadlines, leading to litigation to correct these deficiencies.

22.     On July 12, 2011, the Center and Defendants entered into a comprehensive stipulated settlement agreement that defines Defendants' responsibilities regarding future ESA statutory deadline litigation between these parties.  Stipulated Settlement Agreement, *In re Endangered Species Act Section 4 Deadline Litigation – MDL No. 2165*, No. 10-377 (D.D.C. July 12, 2011), ECF No. 42-1.  The Court approved this settlement agreement on September 9, 2011.  *Id*. ECF No. 56.  This complaint is a "deadline suit" as defined in the parties' settlement.

23.     Under the settlement, the Center may file deadline suits addressing up to 10 species and obtain remedies for up to three of these species, in each fiscal year from 2012 through 2016.  If the Center files suits addressing more than 10 species or obtains remedies from more than three suits in any one of these fiscal years, negotiated deadlines that Defendants must meet under the agreement may be pushed back.  Under the settlement, a "remedy" means a stipulated settlement agreement or judicially enforceable order requiring the FWS to make any finding, listing determination, or critical habitat determination for a species before April 1, 2017.  The instant complaint is a "deadline suit" as defined in the parties' settlement.

24.     During the current fiscal year, the Center has filed a deadline suit for a tenth species, the monarch butterfly, via a separate complaint that has been filed in the U.S. District Court for the District of Arizona.  *Ctr. for Food Safety v. Jewell*, Civ. No. 16-00145-JGZ.

FACTUAL BACKGROUND

A.     Alligator Snapping Turtle

25.     Male alligator snapping turtles weigh up to 175 pounds, have shells more than

two feet in length, and a tail nearly as long, making them the largest freshwater turtles in North

America.  This prehistoric-looking reptile is named for the pronounced ridges on its shell and its

powerful, hooked jaws, which snap shut when frogs, fish, and other prey are lured to a red,

worm-shaped piece of skin attached to its tongue.  Alligator snapping turtles can live up to 100

years and spend most of their adult lives in the deepest parts of rivers, swamps, and lakes,

staying underwater for 40 to 50 minutes before coming up for air.

26.     Alligator snapping turtles live in watersheds that drain into the Gulf of Mexico,

from Georgia and northwestern Florida to eastern Texas, and as far north as southeast Kansas,

southeast Iowa, Illinois, and Indiana.  The species was once common in all but the northern- and

eastern-most portions of this area, but it is estimated the turtle has declined by as much as 95

percent over much of its natural range, with populations likely now extirpated from Iowa,

Illinois, Kentucky, Missouri, and Tennessee.

27.     The drop in alligator snapping turtle populations is primarily due to targeted

capture and habitat degradation.  The species is sold extensively on both the pet market and as

meat, and given its delayed maturation and long life-span, it is extremely sensitive to the effects

of trapping.  Indeed, scientists have found that removing just two adult females could halve a

population of 200 turtles within 50 years, and even removing less than one percent causes long-

term population declines.  Exports of alligator snapping turtles dramatically increased in recent

years, with more than 140,000 wild-caught alligator snapping turtles exported from 2006 to

2010.  Commercial trapping of alligator snapping turtles is now banned in all states where the

species lives, but illegal and legal "personal" captures continue to occur.

28.     Aside from targeted capture, the alligator snapping turtle is also affected by commercial and agricultural development of bottomland hardwood forests and freshwater streams, as well as water pollution, dredging, and dams.

29.     The alligator snapping turtle is listed as a species of concern by the state of Alabama, a threatened species by the states of Georgia and Texas; an endangered species by the states of Illinois and Indiana; a species in need of conservation by the state of Kansas; a species of conservation concern by the state of Louisiana; a nongame species in need of management by the state of Mississippi; an imperiled species by the state of Missouri; a species of special concern by the state of Oklahoma; and a species of greatest conservation need by the state of Tennessee.  NatureServe, a non-profit provider of scientific information to support conservation, and the classifies the species as vulnerable, as does the International Union for the Conservation of Nature ("IUCN"), which studies and identifies species at risk of extinction.

30.     The Center submitted a petition to FWS on July 11, 2012, to list the alligator snapping turtle as endangered or threatened under the ESA due to the ongoing threats to its existence.

31.     FWS issued a 90-day finding on the Center's petition to list the alligator snapping turtle on July 1, 2015.  The finding concluded that the Center's petition presented substantial scientific or commercial information indicating that listing the alligator snapping turtle may be warranted.  80 Fed. Reg. 37,568 (July 1, 2015).

32.     FWS was required to make a 12-month finding as to whether listing the alligator snapping turtle is warranted by July 11, 2013, but it has not made this mandatory finding to date, in violation of the ESA.  16 U.S.C. § 1533(b)(3)(B).

B.     Barrens Topminnow

33.     The Barrens topminnow is an eye-catching fish, with males turning a stunning

blue color with red spots during the breeding season.  But despite its flashy appearance, the fish

lived in virtual obscurity until it was first described by scientists in 1982.  The species is endemic

to the Barrens Plateau of Tennessee, and it was historically found in the Caney Fork River of the

Cumberland River watershed, and the Duck and Elk rivers of the Tennessee River watershed.  It

is considered to be one of the most endangered fish in eastern North America today, declining

from an estimated 4500-5000 individuals in 1983 to just a few hundred by 2004.  Efforts to

reintroduce the Barrens topminnow have been ongoing since 2001, but these efforts have been

unsuccessful in creating self-sustaining populations, and the fish is now found at just four

locations, with each having questionable viability.

34.     The Barrens topminnow primarily lives in the headwaters of creeks, preferring

shallow, still pools that are fed by springs and contain a high amount of vegetation.  Threats to

the Barrens topminnow and its habitat are numerous and varied, including dams; water

diversions; drought; climate change; sedimentation; pesticides and other toxins; dredging;

grazing; urban development; and predation from the invasive mosquitofish.

35.     FWS proposed to list the Barrens topminnow under the ESA in 1977, but the

proposed listing was withdrawn the following year along with about 1,850 others, and the fish is

now only recognized as a species of management concern at the federal level.  The state of

Tennessee lists the Barrens topminnow as endangered, as does the IUCN and the American

Fisheries Society.  NatureServe classifies the fish as critically imperiled.

36.     The Center submitted a petition to FWS on April 20, 2010, to list the Barrens

topminnow as endangered or threatened under the ESA due to the ongoing threats to its

existence.

37.     FWS issued a 90-day finding on the Center's petition to list the Barrens

topminnow on September 27, 2011.  The finding concluded that the Center's petition presented

substantial scientific or commercial information indicating that listing the Barrens topminnow

may be warranted.  76 Fed. Reg. 59,836 (Sept. 27, 2011).

38.     FWS was required to make a 12-month finding as to whether listing the Barrens

topminnow is warranted by April 20, 2011, but it has not made this mandatory finding to date, a

violation of the ESA.  16 U.S.C. § 1533(b)(3)(B).

     C.     Beaverpond Marstonia

39.     The beaverpond marstonia is a tiny freshwater snail that was discovered in 1977

and is only known to occur in a single creek – Cedar Creek – that is located in the Flint River

watershed in Crisp County, Georgia.  Scientists fear this snail is perilously close to extinction,

and surveys have failed to locate even one individual in recent years.  The entire global range of

the species is less than a thousand acres, making it particularly vulnerable to extinction from

stochastic and environmental events.

40.     The beaverpond marstonia lives on aquatic plants, and its known habitat in Cedar

Creek is calm, clear, and cold.  Identified threats include agriculture, water withdrawals, urban

development, recreation, pollution, and dams.

41.     NatureServe considers the beaverpond marstonia to be critically imperiled, and

the IUCN ranks the beaverpond marstonia as critically endangered.

42.     The Center submitted a petition to FWS on April 20, 2010, to list the beaverpond

marstonia as endangered or threatened under the ESA due to the ongoing threats to its existence.

43.     FWS issued a 90-day finding on the Center's petition to list the beaverpond

marstonia on September 27, 2011.  The finding concluded that the Center's petition presented

substantial scientific or commercial information indicating that listing the beaverpond marstonia

may be warranted.  76 Fed. Reg. 59,836 (Sept. 27, 2011).

44.     FWS was required to make a 12-month finding as to whether listing the

beaverpond marstonia is warranted by April 20, 2011, but it has not made this mandatory finding

to date, a violation of the ESA.  16 U.S.C. § 1533(b)(3)(B).

D.     California Spotted Owl

45.     The California spotted owl is the less-famous cousin of the northern and Mexican

spotted owls, and like its counterparts, the species relies on decadent, large trees and snags found

in old-growth forests.  The owls mate for life unless repeated nesting attempts are unsuccessful,

and the species can live for up to 20 years.  California spotted owls are highly territorial, have

high site fidelity, and breed irregularly, typically having just one to two owlets in years they

reproduce.

46.     The range of the California spotted owl overlaps with northern spotted owls in the

southern Cascade Mountains.  It also lives throughout the Sierra Nevada; in the Southern Coast,

Transverse, and Peninsular Ranges of central and southern California; and possibly in northern

Baja California, Mexico.

47.     The majority of land within the owl's range is owned by commercial logging

companies or in National Forests, both of which are subjected to extensive logging operations.

The little old-growth forest habitat that remains is in scattered fragments across the landscape,

and populations have plummeted as this habitat has been cleared.  It is estimated that more than

75 percent of the old growth forests were lost between 1945 and 1993 in the Sierra Nevada due

to logging and other anthropogenic activities, and these numbers have been met or exceeded in

other parts of the owl's range.

48.     FWS declined to list the California spotted owl twice before, but scientists have urged FWS to reevaluate its decision after recent studies documented precipitous population declines over the last two decades.  The population dropped by as much as 22 percent in the southern Cascades in the last 18 years, and scientists estimate the population was cut in half since 1990 in the central Sierra Nevada.  Only one of five study areas showed populations as increasing or stable, and that being in Sequoia and Kings Canyon national parks where commercial logging operations do not occur.  There is also evidence that inbreeding and related genetic disorders are a growing concern, and new evidence that logging is facilitating the invasion of barred owls, which out-compete California spotted owls, into California spotted owl habitat.

49.     The California spotted owl is listed as a species of special concern in California, and the Nevada Natural Heritage Program considers the state's population to be critically imperiled.  NatureServe ranks the owl as vulnerable to extinction.

50.     Conservation organizations submitted petitions to FWS on January 9, 2015, and August 19, 2015, to list the California spotted owl as endangered or threatened under the ESA due to the ongoing threats to its existence.

51.     FWS issued a 90-day finding on the petitions to list the California spotted owl on September 18, 2015.  The finding concluded that the petitions presented substantial scientific or commercial information indicating that listing the California spotted owl may be warranted.  80 Fed. Reg. 56,423 (Sept. 18, 2015).

52.     FWS was required to make a 12-month finding as to whether listing the California spotted owl is warranted by January 9, 2016, but it has not made this mandatory finding to date,

14

a violation of the ESA.  16 U.S.C. § 1533(b)(3)(B).

      E.     <u>Canoe Creek Pigtoe</u>

      53.     The Canoe Creek pigtoe, also known as the Canoe Creek clubshell, is a freshwater mussel that lives in just one place in the world:  Big Canoe Creek, a small tributary of the Coosa River that is part of the Mobile Basin in Alabama.  The mussel was only discovered as a distinct species in 2006, and fewer than two dozen individuals have ever been seen.  Nearly 40 species of aquatic mollusks, possibly many more, have already been extirpated from the Mobile Basin, an area that historically supported one of the most diverse assortments of freshwater mussels in North America, with at least 70 different species.  Without expeditious protection, the Canoe Creek pigtoe is at great risk of suffering the same fate.

      54.     Habitat for the Canoe Creek pigtoe has been significantly impacted by dams and reservoirs, including the loss of nearly 10 miles of Big Canoe Creek by a dam on the Coosa River.  It is also increasingly threatened by water pollution from nutrients, sediment, petroleum products, and pesticides, due largely to the fact that its small range is located between the cities of Birmingham and Gadsden, where the human population and urban sprawl are exploding.  Long-term population trends of the Canoe Creek pigtoe are not known since it is so new to science, but it is estimated that its population is declining by about 10 to 30 percent in the short-term.

      55.     The Alabama Natural Heritage Program and NatureServe both rank the status of the species as critically imperiled.  The American Fisheries Society considers the species to be endangered.

      56.     The Center submitted a petition to FWS on April 20, 2010, to list the Canoe Creek pigtoe as endangered or threatened under the ESA due to the ongoing threats to its

existence.

57.     FWS issued a 90-day finding on the Center's petition to list the Canoe Creek pigtoe on September 27, 2011.  The finding concluded that the Center's petition presented substantial scientific or commercial information indicating that listing the Canoe Creek pigtoe may be warranted.  76 Fed. Reg. 59,836 (Sept. 27, 2011).

58.     FWS was required to make a 12-month finding as to whether listing the Canoe Creek pigtoe is warranted by April 20, 2011, but it has not made this mandatory finding to date, a violation of the ESA.  16 U.S.C. § 1533(b)(3)(B).

    F.     Foothill Yellow-Legged Frog

59.     The foothill yellow-legged frog is a small frog named for the distinctive lemon-lime color on the bottom of its legs.  It is has a wide "vocabulary" with a variety of calls, but the sounds are very faint and are often performed underwater, making the foothill yellow-legged frog rather quiet as compared to most other frogs.  It is also unique from neighboring members of the Ranidae family in that it mates and lays its eggs exclusively in slow-flowing, shallow areas of streams and rivers, but not in ponds or lakes.  Aside from its yellow legs, the foothill yellow-legged frog remains camouflaged by its brown to olive-green colors, and it can better match its surroundings by becoming a lighter or darker color in about a half an hour.

60.     The foothill yellow-legged frog historically was one of the most common amphibians found in Oregon and California, ranging from Marion County in northern Oregon to Los Angeles County, and from the foothills of the western Sierra Nevada to the San Gabriel Mountains – and possibly into Baja California, Mexico.  However, it has disappeared from an estimated 45 percent of its range in California, which likely includes all frogs south of Santa Barbara County, in the southern Sierra Nevada, and in the Tehachapi and San Gabriel

Mountains.  Its status is no better in Oregon, where it is presumed extirpated from most of the northern and far eastern portions of its range, and where it is now missing from more than 55 percent of its native habitat.

61.     Threats to the foothill yellow-legged frog are prolific and ongoing, including dams, water withdrawals, logging, toxic chemicals, livestock grazing, and in-stream mining, as well as emerging threats from climate change and large-scale marijuana growing operations.

62.     The foothill yellow-legged frog is considered vulnerable to extinction by the state of Oregon and is a California Species of Special Concern.  The U.S. Forest Service lists it as a sensitive species in Oregon and California, as does the Bureau of Land Management in Oregon. NatureServe considers the species to be vulnerable, and it is categorized as "near threatened" on the IUCN Red List.

63.     The Center submitted a petition to FWS on July 11, 2012, to list the foothill yellow-legged frog as endangered or threatened under the ESA due to the ongoing threats to its existence.

64.     FWS issued a 90-day finding on the Center's petition to list the foothill yellow-legged frog on July 1, 2015.  The finding concluded that the Center's petition presented substantial scientific or commercial information indicating that listing the foothill yellow-legged frog may be warranted.  80 Fed. Reg. 37,568 (July 1, 2015).

65.     FWS was required to make a 12-month finding as to whether listing the foothill yellow-legged frog is warranted by July 11, 2013, but it has not made this mandatory finding to date, a violation of the ESA.  16 U.S.C. § 1533(b)(3)(B).

G.     Northern Rockies Fisher

66.     The Northern Rockies fisher is a member of the weasel family with a face that

resembles a fox; short, rounded ears; and a long, bushy tail.  Though it is the size of a house cat

and has a rather sweet appearance, fishers are formidable predators and one of the few animals

that can successfully prey upon porcupines, which they kill by repeatedly biting in the face for

up to a half-hour.  The Northern Rockies fisher was recognized as a distinct species only in 2011

after genetic differences were discovered between it and other fishers.  Like other fishers, the

Northern Rockies fisher relies on healthy, mature forests to survive – requiring large, old trees

and a dense canopy to forage, den, mate, and escape from predators.

     67.    The Northern Rockies fisher once ranged from eastern British Columbia and

southwestern Alberta through northeastern Washington, Idaho, Montana, northwest Wyoming,

and north-central Utah.  Today it lives in a fraction of this former range, with small populations

found only along the border of Montana and northern Idaho.

     68.    The thick, glossy fur of the Northern Rockies fisher has long attracted trappers,

and after nearly wiping out the species entirely during the last century, trapping continues to be

the largest source of direct mortality to the species due to incidental capture.  The number of

furbearer trapping licenses has skyrocketed in the last ten years, elevating these threats even

more.  Additionally, fishers are threatened by logging and development, and studies show they

are also susceptible to poisoning from rodenticides and negative effects from climate change.

The U.S. Forest Service considers the fisher to be a sensitive species in its range of Idaho and

Montana.

     69.    The Center and other allies submitted a petition to FWS on September 23, 2013,

to list the Northern Rockies fisher as endangered or threatened under the ESA due to the ongoing

threats to its existence.

     70.    FWS issued a 90-day finding on the Center's petition to list the Northern Rockies

fisher on January 12, 2016.  The finding concluded that the Center's petition presented

substantial scientific or commercial information indicating that listing the Northern Rockies

fisher may be warranted.  81 Fed. Reg. 1368 (Jan. 12, 2016).

71.     FWS was required to make a 12-month finding as to whether listing the Northern

Rockies fisher is warranted by September 23, 2014, but it has not made this mandatory finding to

date, a violation of the ESA.  16 U.S.C. § 1533(b)(3)(B).

H.     Virgin River Spinedace

72.     The Virgin River spinedace is a unique desert minnow that is endemic to the

Virgin River of the American Southwest, which flows from Zion National Park and Red Cliffs

National Conservation Area to the Colorado River, running the boundary that divides the

Colorado Plateau and Great Basin.  The fish prefers clear, cool, flowing streams that contain

pools, runs, and riffles.  The Virgin River spinedace is one of only four species in its genus, with

one of those already being extinct and all three others at risk of sharing the same fate.

73.     The spinedace was once common throughout the Virgin River basin in

northwestern Arizona, southeastern Nevada, and southwestern Utah, but its range is now reduced

by 55 percent.  This habitat loss is primarily due to dams and water withdrawals, and today,

scattered, remnant populations are isolated from one another where excessive water withdrawals

completely dry up the river.  Human population numbers and development are expanding in the

remaining areas where the spinedace still survives, threatening to take more water from the

Virgin River and cause additional problems such as water pollution.  The fish is also sensitive to

the effects of climate change such as drought, changes in water temperature, and an increase in

the intensity and frequency of large floods, and disease.

74.     The Virgin River spinedace is designated as a sensitive species by the state of

Utah, an at-risk species by the state of Nevada, and as an endangered species by the state of

Arizona.  The Bureau of Land Management considers it to be a sensitive species.  NatureServce

ranks the spinedace as critically imperiled, and the American Fisheries Society lists it as

endangered.

75.     The Center submitted a petition to FWS on November 20, 2012, to list the Virgin

River spinedace as endangered or threatened under the ESA due to the ongoing threats to its

existence.

76.     FWS issued a 90-day finding on the Center's petition to list the Virgin River

spinedace on September 18, 2015.  The finding concluded that the Center's petition presented

substantial scientific or commercial information indicating that listing the Virgin River spinedace

may be warranted.  80 Fed. Reg. 56,423 (Sept. 18, 2015).

77.     FWS was required to make a 12-month finding as to whether listing the Virgin

River spinedace is warranted by November 20, 2013, but it has not made this mandatory finding

to date, a violation of the ESA.  16 U.S.C. § 1533(b)(3)(B).

I.     Wood Turtle

78.     The wood turtle lives in a broad range of North America, extending from eastern

Canada to Minnesota and Virginia.  It shares its genus with just one other animal, the bog turtle,

which is listed as a threatened species under the ESA.

79.     The wood turtle hibernates in the bottom or on the banks of streams where water

flows all winter, and it spends much of its time in or near water during the summer months,

though it is also known to wander throughout a variety of terrestrial habitat.  The species has a

unique and interesting technique for attracting its food of choice, stomping its front feet to cause

earthworms to rise to the earth's surface.  The wood turtle is considered to be a handsome and

20

remarkably intelligent reptile, making it a highly desirable target of the pet trade.

80.     The wood turtle is now considered to be one of the most endangered freshwater turtles in North America, as this once abundant species is now rare and declining across its range, with the population down by as much as 70 percent.  Residential and industrial development are among the greatest reasons for this decline, as it is targeted capture for the pet trade, which can easily wipe out an entire population in just one or two seasons.  Other threats include dams, logging, water pollution, and being run over by vehicles.

81.     With the exception of Maine, all states within the range of the wood turtle list prohibit take of the species and several also list it as endangered or threatened.  However, it has been noted that these state efforts have done little to protect the species or prevent additional captures.  NatureServe categorizes the species as vulnerable, and the IUCN considers it to be endangered.

82.     The Center submitted a petition to FWS on July 11, 2012, to list the wood turtle as endangered or threatened under the ESA due to the ongoing threats to its existence.

83.     FWS issued a 90-day finding on the Center's petition to list the wood turtle on September 18, 2015.  The finding concluded that the Center's petition presented substantial scientific or commercial information indicating that listing the wood turtle may be warranted.  80 Fed. Reg. 56,423 (Sept. 18, 2015).

84.     FWS was required to make a 12-month finding as to whether listing the wood turtle is warranted by July 11, 2013, but it has not made this mandatory finding to date, a violation of the ESA.  16 U.S.C. § 1533(b)(3)(B).

CLAIMS FOR RELIEF
FIRST CLAIM FOR RELIEF
Violation of the ESA: Failure to Make a Timely 12-Month Finding for the
Alligator Snapping Turtle

85.     Plaintiff hereby incorporates all preceding paragraphs.

86.     FWS's failure to make a timely 12-month finding on the Center's petition to list the alligator snapping turtle as an endangered or threatened species violates the ESA, 16 U.S.C. § 1533(b)(3)(B), and constitutes agency action that has been "unlawfully withheld or unreasonably delayed" within the meaning of the APA.  5 U.S.C. § 706(1).

SECOND CLAIM FOR RELIEF
Violation of the ESA: Failure to Make a Timely 12-Month Finding for the Barrens Topminnow

87.     Plaintiff hereby incorporates all preceding paragraphs.

88.     FWS's failure to make a timely 12-month finding on the Center's petition to list the Barrens topminnow as an endangered or threatened species violates the ESA, 16 U.S.C. § 1533(b)(3)(B), and constitutes agency action that has been "unlawfully withheld or unreasonably delayed" within the meaning of the APA.  5 U.S.C. § 706(1).

THIRD CLAIM FOR RELIEF
Violation of the ESA: Failure to Make a Timely 12-Month Finding for the
Beaverpond Marstonia

89.     Plaintiff hereby incorporates all preceding paragraphs.

90.     FWS's failure to make a timely 12-month finding on the Center's petition to list the beaverpond marstonia as an endangered or threatened species violates the ESA, 16 U.S.C. § 1533(b)(3)(B), and constitutes agency action that has been "unlawfully withheld or unreasonably delayed" within the meaning of the APA.  5 U.S.C. § 706(1).

## FOURTH CLAIM FOR RELIEF
### Violation of the ESA: Failure to Make a Timely 12-Month Finding for the California Spotted Owl

91.     Plaintiff hereby incorporates all preceding paragraphs.

92.     FWS's failure to make a timely 12-month finding on the Center's petition to list the California spotted owl as an endangered or threatened species violates the ESA, 16 U.S.C. § 1533(b)(3)(B), and constitutes agency action that has been "unlawfully withheld or unreasonably delayed" within the meaning of the APA.  5 U.S.C. § 706(1).

## FIFTH CLAIM FOR RELIEF
### Violation of the ESA: Failure to Make a Timely 12-Month Finding for the Canoe Creek Pigtoe

93.     Plaintiff hereby incorporates all preceding paragraphs.

94.     FWS's failure to make a timely 12-month finding on the Center's petition to list the Canoe Creek pigtoe as an endangered or threatened species violates the ESA, 16 U.S.C. § 1533(b)(3)(B), and constitutes agency action that has been "unlawfully withheld or unreasonably delayed" within the meaning of the APA.  5 U.S.C. § 706(1).

## SIXTH CLAIM FOR RELIEF
### Violation of the ESA: Failure to Make a Timely 12-Month Finding for the Foothill Yellow-Legged Frog

95.     Plaintiff hereby incorporates all preceding paragraphs.

96.     FWS's failure to make a timely 12-month finding on the Center's petition to list the foothill yellow-legged frog as an endangered or threatened species violates the ESA, 16 U.S.C. § 1533(b)(3)(B), and constitutes agency action that has been "unlawfully withheld or unreasonably delayed" within the meaning of the APA.  5 U.S.C. § 706(1).

SEVENTH CLAIM FOR RELIEF
Violation of the ESA: Failure to Make a Timely 12-Month Finding for the
Northern Rockies Fisher

97.     Plaintiff hereby incorporates all preceding paragraphs.

98.     FWS's failure to make a timely 12-month finding on the Center's petition to list

the Northern Rockies fisher as an endangered or threatened species violates the ESA, 16 U.S.C.

§ 1533(b)(3)(B), and constitutes agency action that has been "unlawfully withheld or

unreasonably delayed" within the meaning of the APA.  5 U.S.C. § 706(1).

EIGHTH CLAIM FOR RELIEF
Violation of the ESA: Failure to Make a Timely 12-Month Finding for the
Virgin River Spinedace

99.     Plaintiff hereby incorporates all preceding paragraphs.

100.    FWS's failure to make a timely 12-month finding on the Center's petition to list

the Virgin River spinedace as an endangered or threatened species violates the ESA, 16 U.S.C. §

1533(b)(3)(B), and constitutes agency action that has been "unlawfully withheld or unreasonably

delayed" within the meaning of the APA.  5 U.S.C. § 706(1).

NINTH CLAIM FOR RELIEF
Violation of the ESA: Failure to Make a Timely 12-Month Finding for the Wood Turtle

101.    Plaintiff hereby incorporates all preceding paragraphs.

102.    FWS's failure to make a timely 12-month finding on the Center's petition to list

the wood turtle as an endangered or threatened species violates the ESA, 16 U.S.C. §

1533(b)(3)(B), and constitutes agency action that has been "unlawfully withheld or unreasonably

delayed" within the meaning of the APA.  5 U.S.C. § 706(1).

REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court enter Judgment for Plaintiff providing the following relief:

A.     Declare that Defendants violated the ESA and/or the APA by failing to issue timely 12-month findings as to whether listing the alligator snapping turtle, Barrens topminnow, beaverpond marstonia, California spotted owl, Canoe Creek pigtoe, foothill yellow-legged frog, Northern Rockies fisher, Virgin River spinedace, and wood turtle is warranted;

B.     Order Defendants to issue, by dates certain, findings as to whether listing the alligator snapping turtle, Barrens topminnow, beaverpond marstonia, California spotted owl, Canoe Creek pigtoe, foothill yellow-legged frog, Northern Rockies fisher, Virgin River spinedace, and wood turtle is warranted, 16 U.S.C. § 1533(b)(3)(B);

C.     Grant Plaintiff its attorneys' fees and costs in this action as provided by the ESA, 16 U.S.C. § 1540(g)(4), or the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D.     Provide such other relief as the Court deems just and proper.

Dated: March 16, 2016                    Respectfully submitted,

                                         Amy R. Atwood, DC Bar No. 470258
                                         Center for Biological Diversity
                                         P.O. Box 11374
                                         Portland, OR 97211-0374
                                         Telephone: (971) 717-6401
                                         Facsimile: (503) 283-5528
                                         Email: atwood@biologicaldiversity.org

                                         *Attorney for Plaintiff*